No. 100,726

STATE OF KANSAS, *Appellant*, v. COMPREHENSIVE HEALTH OF
PLANNED PARENTHOOD OF KANSAS AND MID-MISSOURI, INC.,
*Appellee*.

(241 P.3d 45)

Opinion filed October 15, 2010.

*Steven J. Obermeier,* assistant district attorney, argued the cause, and *Phill Kline,* district attorney, and *Steve Six,* attorney general, were with him on the briefs for appellant.

*Pedro L. Irigonegaray,* of Irigonegaray & Associates, argued the cause, and *Robert V. Eye* and *Elizabeth R. Herbert,* of the same firm, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This interlocutory appeal is the latest in a related series of actions arising out of an inquisition conducted by former Attorney General Phill Kline regarding the performance of abortions in Kansas. In this case, we are asked to rule on whether a Johnson County district judge erred in quashing subpoenas directed at various employees of the Kansas Department of Health and Environment ("KDHE") and at Shawnee County District Judge Richard D. Anderson and attorney Stephen W. Cavanaugh.

Although the issues before us are simply summarized, their resolution is not because they arise in a complicated factual and procedural context, revealed in fits and starts over the life of a series of cases. Like icebergs, the appearance of the issues above the waves is relatively benign; their mass and shape below the waves goes unnoticed or ignored at peril.

We therefore begin by setting forth a list of the cases in the series and then a chronology of pertinent events, taking care to guard the twin imperatives of patient privacy and criminal prosecution that we discussed in our first opinion in these related actions, *Alpha Medical Clinic v. Anderson*, 280 Kan. 903, 128 P.3d 364 (2006). Although not all of the information we review below has become public knowledge since the *Alpha* decision, much of it has. In addition, to the extent any of the following goes beyond what has previously been made or become public, we take care to ensure that no privacy or law enforcement goal is threatened. The chronology, dependent in part on documents and transcripts never supplied to this court before this appeal, is necessary to an understanding of our analysis and rulings.

We also emphasize that nothing in this opinion should be interpreted by the parties as license to publish or otherwise disseminate material sealed under our previous orders or previous orders of our district courts. As in *Alpha*, "[w]e caution all parties to resist" any such impulse, "which may imperil the privacy of the patients and the law enforcement objectives at the heart of this proceeding." 280 Kan. at 930.

### The Series of Cases

- Case No. 04-IQ-03. Inquisition launched by Kline while Attorney General filed in district court in Shawnee County ("the Inquisition").
- Case No. 93,383 in the Supreme Court. Petition for Writ of Mandamus filed by two abortion clinics regarding the Inquisition subpoenas for patient records. This petition led to this court's opinion, *Alpha*, 280 Kan. at 903 ("*Alpha*").
- Case No. 97,554 in the Supreme Court. Petition for Writ of Mandamus filed by two abortion clinics regarding Kline's ap-

pearance before the 2006 election on "The O'Reilly Factor" and other alleged dissemination of information from patient records ("the publicity mandamus action").

- Case No. 98,747 in the Supreme Court. Petition for Writ of Mandamus filed by Comprehensive Health of Planned Parenthood of Kansas and Mid-Missouri, Inc. ("CHPP"), regarding Kline's movement of records from Attorney General's office to Johnson County District Attorney's office. This petition led to this court's opinion in *Comprehensive Health of Planned Parenthood of Kansas v. Kline*, 287 Kan. 372, 197 P.3d 370 (2008) (*"Comprehensive Health"*).
- Case No. 07 CR 2112. Criminal prosecution filed by former Attorney General Paul Morrison in Sedgwick County against Dr. George Tiller, a Wichita physician who performed abortions, which ended in an acquittal after jury trial ("the Tiller case").
- Case No. 99,050 in the Supreme Court. Petition for Writ of Mandamus filed by Morrison against Judge Anderson seeking surrender of redacted patient records produced in the Inquisition and left in the judge's custody (*"Morrison v. Anderson"*).
- Case No. 07 CR 2701. Criminal prosecution filed by Kline while Johnson County District Attorney against CHPP, which is the case underlying this appeal ("this criminal prosecution").

Other proceedings before grand juries in Johnson and Sedgwick Counties regarding abortion providers, including one that led to a Petition for Writ of Mandamus in this court, eventually denied, and various related disciplinary matters are not listed above. Although some of these proceedings and disciplinary matters were contemporaneous with the cases on the list, they had no direct effect on their pursuit or disposition.

## FACTUAL AND PROCEDURAL BACKGROUND

The first crystals of the particular icebergs before us now were formed when Kline, in his capacity as Attorney General from January 13, 2003, to January 8, 2007, opened the Inquisition under the judicial supervision of Judge Anderson in Shawnee County.

As part of the Inquisition, Kline and his staff obtained copies of certain reports of abortions performed in 2003 in Kansas that were filed by clinics with KDHE. The entire group of reports produced by KDHE has never been filed or deposited with or otherwise disclosed to this court in this or any related action. This court is, therefore, necessarily dependent upon other's descriptions of these items.

According to the record before us, the reports produced by KDHE do not contain patient names, but patients are identified by numbers and other data, including age; marital status; state, county, and city of residence; ancestry and race; level of education; number of live and deceased children, if any; gestational age of the terminated pregnancy; and the date the patient's abortion was performed. The reports also do not contain the names of abortion providers, who are identified by a code number. But there is no dispute—and no secret at this time—that the KDHE reports at issue in this appeal are among those filed with the agency by defendant CHPP and later sought from KDHE by Kline during the Inquisition.

Kline, as Attorney General, also sent subpoenas duces tecum in the Inquisition to obtain certain patient medical records directly from two Kansas clinics that performed abortions. Those subpoenas, and Judge Anderson's refusal to quash or modify them, led the clinics to file the petition for writ of mandamus in *Alpha*. At the time, the clinics were referred to as Alpha and Beta; they are now known to include defendant CHPP. See *Comprehensive Health*, 287 Kan. at 375.

As a result of the clinics' *Alpha* petition, we ruled in February 2006 that Judge Anderson must first evaluate the soundness of Kline's interpretation of the criminal statutes at issue to determine if there was a firm legal ground supporting the Inquisition. See *Alpha*, 280 Kan. at 924. If Kline's theory passed muster, the clinics could be compelled under the subpoenas to produce the patient medical records after redaction of patient-identifying information, performed under the supervision of Judge Anderson and experts to be named by him. See *Alpha*, 280 Kan. at 924-25.

## Post-Alpha *Treatment of Patient Records*

After the *Alpha* decision, Judge Anderson's review of the Inquisition's legal basis, and the redactions that followed, Kline and his staff received CHPP patient records for copying on October 24, 2006. We described some of what happened in our *Comprehensive Health* opinion:

"Shortly after the records were given to Kline, he and two of his subordinates, lawyers [Eric] Rucker and Stephen Maxwell, presented Judge Anderson with a summary of the records that Kline wanted to disclose publicly. Kline was in the final days of a highly contentious political race to retain his position; his opponent was then Johnson County District Attorney Paul Morrison. According to Judge Anderson, Kline—who had argued unsuccessfully to Judge Anderson while *Alpha* was pending before this court that the judge should not subject Kline to the nondisclosure provision in the subpoenas directed to the clinics—took an 'aggressive' position on the summary and his potential use of it. In Judge Anderson's view, Kline appeared "somewhat desperate" to counter charges advanced by Morrison in the campaign. Kline also told Judge Anderson that he did not believe the judge could control what an attorney general disclosed to the public. Regardless of the merit or lack of merit of that view, Judge Anderson warned Kline that he would have trouble persuading Judge Anderson to rule in his favor on any future inquisition issues if he publicly disclosed information from the patient records. At no point in this discussion with Judge Anderson did Kline, Rucker, or Maxwell divulge any plans for television or other public appearances concerning the inquisition or its results.

"On November 3, 2006, the Friday before election day and before Kline's subordinates returned the originals of the redacted records to Judge Anderson, Kline was a guest on a nationally televised program, 'The O'Reilly Factor.' During the broadcast, host Bill O'Reilly suggested that O'Reilly had been made privy to the contents of the redacted records. Kline later testified that he 'certainly' considered his appearance on O'Reilly's show to be appropriate despite this court's cautionary language about publicity in *Alpha* and apparently despite Judge Anderson's insistence that Kline and his subordinates were bound by the subpoenas' nondisclosure provision. Kline testified that he had decided to appear on the O'Reilly program because his office had been inundated with calls about his intentions, and he wanted to alleviate fears that his office was seeking identities of patients.

"Kline's appearance on 'The O'Reilly Factor' prompted the clinics to press Judge Anderson to hold Kline in contempt before election day. They also filed [the publicity mandamus action under seal] with this court on the day before election day, November 6, 2006, seeking a stay of the inquisition, sealing of the records from Kline's office, and deposit of the records with a special prosecutor

or master appointed to investigate any leak of information from, or other mishandling of, the records.

"Morrison defeated Kline in the attorney general's race. Approximately 2 weeks after the election, Judge Anderson declined to launch contempt proceedings against Kline in connection with the O'Reilly show. Although Judge Anderson would later testify that he was "very upset" with Kline for putting himself in a position allowing O'Reilly to claim he had seen the redacted patient records, Judge Anderson had concluded after questioning Kline, Maxwell, and Kline investigator Tom Williams under oath that Kline had not given the records to O'Reilly, if, in fact, O'Reilly had seen them at all. We denied the clinic's November 6 petition for writ of mandamus on November 30, 2006.

"During the 2 weeks after the elections, Kline, Rucker, Maxwell, and Williams shared information from the redacted patient records and other inquisition results with at least three potential medical experts, including Dr. Richard Gilmartin, a pediatric neurologist from Wichita, and Dr. Paul McHugh, a psychiatrist from Baltimore, Maryland. Rucker had obtained Gilmartin's name from a representative of Kansans for Life; he would later testify that he may have told the representative about the nature of the records. Kline had obtained McHugh's name from a representative of Women Influencing the Nation. Both Kansans for Life and Women Influencing the Nation are anti-abortion advocacy organizations.

"The record before us reflects that Gilmartin took no notes and that no patient records were left with him. Maxwell and Williams evidently left copies of patient records and other inquisition documents with McHugh. These other documents included pregnancy termination information obtained from [KDHE,] which, when cross-referenced to patient records and/or other sources mined by Kline and his subordinates during the inquisition, enabled Kline to identify patients by name. The record reflects that the time period when Kline and his subordinates were seeking the cross-reference data was before or during the pendency of *Alpha*. The record is unclear on exactly when McHugh returned the records left with him or whether he first made copies before returning the set he had been given. Judge Anderson had not required Kline or his subordinates to obtain confidentiality agreements from any persons to whom the records themselves or information within them was disseminated; and Kline and his subordinates did not take this step on their own.

"On December 11, 2006, Republican precinct committee members in Johnson County selected Kline to complete Morrison's term as Johnson County District Attorney, once Morrison was sworn in as Attorney General on January 8, 2007.

"It was in this time frame that Kline and Maxwell conversed with Judge Anderson about Kline's desire to send the patient records produced by the clinics in the inquisition to other prosecutors, specifically mentioning Shawnee, Sedgwick, and Johnson Counties. According to Judge Anderson, Kline and Maxwell did not tell him how this would be accomplished; they did not tell him that the records would not be received in Johnson County until Kline had taken office there; they did not tell him that they also would send the records from WHCS, a clinic in

Sedgwick County, to Johnson County. Kline did tell Judge Anderson that the transformation of his Attorney General inquisition into a Johnson County District Attorney investigation would be 'seamless.' Judge Anderson would eventually testify that, during one of his conversations with Maxwell about the movement of patient records to Johnson County, he told Maxwell, 'Just be sure that you do that in a very orderly and regular sort of way.'

"Shortly before leaving the Attorney General's office, on December 20, 2006, Kline filed charges in Sedgwick County against Dr. George Tiller of [Women's Health Care Services of Wichita, P.A. (WHCS)]. Kline supported the charges with an affidavit from McHugh, an affidavit from Williams, and information from the redacted patient records. The following day, District Judge Paul Clark dismissed the Sedgwick County charges at the request of Sedgwick County District Attorney Nola Foulston.

"On December 27 or 28, 2006, Kline announced that, as Attorney General, he would appoint Wichita lawyer and anti-abortion activist Donald McKinney as a special prosecutor. The clinics filed a joint motion for a protective order with Judge Anderson, seeking to ensure that the patient records produced in the inquisition would remain with Judge Anderson and in the Attorney General's office on Kline's exit from that office. The record reflects that Judge Anderson received this motion on Wednesday, January 3, 2007, but he did not rule on it immediately. Judge Anderson did, however, tell Maxwell that he wanted a full and accurate written report on where all copies of the patient records were as of the time of the transition between Kline and Morrison at the Attorney General's office.

"Although Kline later testified that he directed Rucker to transport the records from the Attorney General's office to Johnson County in mid-December 2006, the actual physical movement of the records did not begin until the Friday before Morrison was sworn in as Attorney General, January 5, 2007, and did not end until Kline had been in office as the Johnson County District Attorney for several weeks. In the intervening time, the patient records were stored in more than one automobile; in Maxwell's residence; and, from January 8, 2007, until mid-February 2007, in the dining room of an apartment of another investigator, Jared Reed. The several weeks that the records sat in Reed's dining room included the day that elapsed between the point when Reed's employment with Kline's Attorney General's office ended and the point when his employment by Kline's Johnson County District Attorney's office began.

"On Friday, January 5, 2007, the same day that Rucker signed a 6-month contract with McKinney, McKinney's fees to be funded by up to $25,000, apparently from the budget of the Attorney General's office, Williams removed all of the patient records obtained through the inquisition from the Attorney General's office, along with additional investigation materials and records obtained from other agencies, and placed them in a state-owned vehicle. This Friday was to be Maxwell's last day of work for the Attorney General's office. The following day, Saturday, January 6, Williams delivered the records and other materials to Maxwell's residence.

"At Maxwell's residence that day, Maxwell and Williams sorted the records for distribution to various places. At some point that day, Williams contacted Reed, who came to Maxwell's residence and witnessed this process. Maxwell also was preparing a Status and Disposition Report, the written report Judge Anderson requested. The patient records and other materials were then locked in the trunk of a state-owned vehicle Williams was driving. Williams returned a set of materials to the Attorney General's office, not including any CHPP or WHCS patient records, and left the rest of the materials sorted earlier at Maxwell's house in the vehicle. The vehicle spent the rest of that weekend parked in a secure state parking lot.

"Shortly after 8 a.m. on Monday, January 8, 2007, the day Morrison was to be sworn in as Attorney General and Kline sworn in as Johnson County District Attorney, Williams and Reed met at the Shawnee County courthouse. They left five boxes of investigation materials at Judge Anderson's chambers, as well as a copy of the Status and Disposition Report. Williams and Reed also left several boxes of materials, including patient records, at Shawnee County District Attorney Robert D. Hecht's office.

"After these two distributions had been accomplished, Williams received a telephone call from Rucker, who had spoken to Kline that morning before Kline was sworn in as Johnson County District Attorney. Kline had called Rucker to make sure that the patient records would be available in Johnson County and told Rucker for the first time that the materials going there needed to include records from WHCS as well as from CHPP. Kline indicated to Rucker that Judge Anderson had given permission for this to occur. Rucker, in turn, told Williams that the records headed for Johnson County needed to include the records from WHCS as well as CHPP. Williams expressed surprise and displeasure with what he apparently viewed as a last-minute change in his instructions and because the Status and Disposition Report produced and signed by Maxwell and left earlier that morning with Judge Anderson did not state that the WHCS records would go to the Johnson County District Attorney's office. According to Williams, Rucker told him that Kline had nevertheless ordered this action and that Kline had spoken to Judge Anderson about it. Williams asked for written confirmation of this order.

"After the call from Rucker, Williams and Reed had to retrieve the patient records that had already been left at Hecht's office. On Rucker's instruction, they then took the records to a downtown Topeka photocopy store. Although Reed's and Williams' recollections vary slightly, apparently Reed began making copies of the WHCS records for use by Kline as Johnson County District Attorney (at the expense of the Attorney General's office) while Williams returned the state automobile they had been using. After the copying was completed, Williams and Reed returned the set meant for Hecht to his office. All of the material intended for the Johnson County District Attorney's office was then transported in Reed's personal automobile and delivered to Reed's apartment, where it was placed in his dining room.

"According to the record, at 3:43 that afternoon, several hours after all of the distribution steps were completed and Morrison had been sworn in as Attorney General, in apparent compliance with Williams' request for written confirmation of the earlier order, Rucker sent an electronic mail to Williams. It stated: 'Per the direction of AG Kline, I am directing you to copy all medical files and AG Kline is directing the copies be delivered . . . to the District Attorney for the 10th Judicial District before noon . . . K. Rucker Chief Deputy Attorney General (sent at 9:30 am)[.]'

"Although Kline's subordinates had placed at least three boxes of materials connected to the inquisition at the Attorney General's office before they left it, the precise content of these boxes cannot be determined at this stage because no specific inventory of them was created at the time. We understand, however, as mentioned above, that the boxes contained no copies of the patient records obtained from CHPP or WHCS." 287 Kan. at 378-84.

Judge Anderson's Response filed in the publicity mandamus action in this court included expressions of his views on the validity of Kline's legal theories regarding inadequate record-keeping and reporting by CHPP. These opinions apparently arose out of the judge's observations regarding the redacted patient records as produced. Per *Alpha*, Judge Anderson had appointed Topeka lawyer Stephen W. Cavanaugh as special counsel for adult patients and guardian ad litem for minor patients whose records were sought in the Inquisition to "protect against release of sensitive, confidential, and privileged information which is not relevant to the medical procedure and/or the criminal investigation" and to "supervise the reproduction and release of copies of all medical records." The attachments to Judge Anderson's response in the publicity mandamus action included three pieces of June and July 2006 correspondence between Cavanaugh and CHPP counsel concerning the types of information that could be redacted from patient records. Judge Anderson also attached a November 8, 2006, Cavanaugh affidavit regarding the redaction of the patient records.

*Further Proceedings Before Judge Anderson and This Court*

Before and after Kline and Morrison effectively traded prosecutorial offices on January 8, 2007, cooperation between their offices on the Inquisition and the evidence it had uncovered can be fairly described as nil. For example, Kline alleged that Morrison prevented Kline from having secure access and storage to the dis-

trict attorney's office in Johnson County. In addition, on March 27, 2006, it was necessary for Judge Anderson to permit Morrison's office to make copies of the CHPP patient records in the Inquisition files in Judge Anderson's possession because Kline had left no copies behind in the Attorney General's office.

By April 10, 2007, Judge Anderson summoned Veronica Dersch, one of the attorneys in Morrison's Attorney General's office, to a closed Inquisition conference on the record. He told her, among other things, that Kline and Maxwell had contacted him about obtaining additional information regarding CHPP in the Inquisition. He again expressed his opinion of Kline's evidence, this time on the need for a prosecutorial evaluation of its merit. He also said that he wanted to deal with only one prosecutorial office on the Inquisition.

The next day, when Kline and several other representatives of the Johnson County District Attorney's office and several representatives of Morrison's Attorney General's office appeared before Judge Anderson for another closed Inquisition hearing, Judge Anderson again offered his opinion on Kline's legal theories. Despite his compliments to Kline, however, Judge Anderson stated that Morrison's office would control the Inquisition from that day on. He said to Kline:

"Let's make sure that we have an understanding from this point forward. I do not consider the inquisition to be owned by you. When you lost the election and there was a new administration that came on, my interpretation is that Attorney General Paul Morrison and his assistants are in control of the investigation. . . .

. . . .

"They own the investigation now as the Kansas Attorney General."

Judge Anderson nevertheless deferred ruling on a Morrison request to order Kline to return copies of CHPP patient records. Judge Anderson noted that Kline was free to launch a new inquisition in Johnson County, "[b]ut that does not seem to be in the interests of justice to slow an investigation, to impair the ability to prosecute crimes."

When Judge Anderson issued a formal ruling rejecting Morrison's request for return of Kline's copies of the CHPP patient records and other original investigative materials on April 18, 2007,

he repeated his statements from the April 11 hearing. Given Kline's assertion that he had evidence to support his belief that crimes had been committed, Judge Anderson's Memorandum Decision said: "The public interest would not be reasonably advanced and could even be impaired by ordering the return of medical records."

Judge Anderson also rejected a similar request from CHPP on May 15, 2007, refusing to order Kline to return his copies of patient records to the clinic. CHPP then filed its sealed *Comprehensive Health* petition for writ of mandamus in this court against Kline on June 6, 2007. It was this mandamus action that focused on the irregularity of Kline's transfer of clinic patient records and other Inquisition files from himself as Attorney General to himself as Johnson County District Attorney. Large portions of the file in *Comprehensive Health* were eventually unsealed by this court by order dated May 2, 2008.

Meanwhile, Morrison sent a clearance letter to CHPP counsel on June 25, 2007, stating that he had decided not to file charges against the clinic and that he was closing the Inquisition Kline had pursued. On July 9, 2007, Morrison filed a motion with Judge Anderson, seeking return of all Inquisition files in Judge Anderson's possession; and, on July 10, 2007, Morrison wrote to Judge Anderson, informing the judge that he was closing the Inquisition.

Two days later, CHPP counsel Pedro Irigonegaray appeared unannounced at Judge Anderson's chambers, seeking surrender of the CHPP patient records in Judge Anderson's custody. Judge Anderson refused counsel's request.

Judge Anderson then sent a letter to Morrison and Kline, dating it July 13, 2007. The letter formalized Judge Anderson's refusal to turn CHPP patient records over to CHPP counsel and his ruling against Morrison on the motion for return of patient records and other Inquisition files in the custody of Judge Anderson. The judge emphasized that any patient records in his possession were redacted and secure. He also said that "collateral investigations" regarding the management of the records were yet to be resolved. He apparently was referring to *Comprehensive Health* in this court and at least one investigation that had been initiated by the Disciplinary Administrator. Judge Anderson further stated that Kline

had informed him that the investigation of CHPP continued in Johnson County, based on Kline's allegations that CHPP improperly redacted information from the patient records produced and that some records "may have been fabricated." Judge Anderson said he had resisted opening a second inquisition for Kline in Shawnee County and had told Kline any allegations "could be explained to another judge" in Johnson County. Regardless, Judge Anderson wrote, he believed "the records as originally produced by [CHPP] should be maintained by this Court until transferred to another Court having jurisdiction over any investigation and charges and/or until all collateral disputes and investigations have been resolved." In a second letter sent the same day to Morrison only, Judge Anderson also refused to surrender patient records from WHCS that were produced in the Inquisition.

Five days later, Morrison filed a motion to intervene in *Comprehensive Health* in this court; his motion ultimately was granted.

Morrison also filed his own sealed mandamus action against Judge Anderson in this court, *Morrison v. Anderson*, on August 2, 2007. Morrison argued that, given the Inquisition's closed status, Judge Anderson no longer had jurisdiction nor a reason to maintain court custody of documents the Inquisition had generated. (Large portions of the file in this case were eventually unsealed by this court by order dated May 2, 2008.)

On September 25, 2007, after Morrison had been permitted to intervene in *Comprehensive Health*, Morrison filed a sealed Memorandum in Support of CHPP's petition accusing Kline of engaging in improprieties in the transfer of patient records from the Attorney General's office to the Johnson County District Attorney's office. The Appendix to the Memorandum included, among other items, a copy of Maxwell's Status and Disposition Report; transcripts of the April 10, 2007, Inquisition conference between Judge Anderson and Dersch as well as the April 11, 2007, Inquisition conference; Judge Anderson's April 18, 2007, Memorandum Decision; Judge Anderson's July 13, 2007, letter to Kline and Morrison; Judge Anderson's July 13, 2007, letter to Morrison alone; and a transcript of a deposition of Reed, which described Kline's transfer of clinic patient records to Johnson County. The filing of this

Memorandum and Appendix led to this court's October 5, 2007, order in *Comprehensive Health*, providing that no further copying and/or dissemination of records obtained through subpoenas to the clinics during the time Kline had served as Attorney General could be effected without further order of this court. An exception was set forth for copying or dissemination "as required for the pursuit of a law enforcement investigation or court proceeding."

*Beginning of This Criminal Prosecution and Continuing Mandamus Actions*

As Johnson County District Attorney, Kline filed this action against CHPP on October 17, 2007. District Judge James F. Vano ordered the complaint and any documents filed with it to be placed under seal. Counts 1 through 23 of the complaint allege felony violation of K.S.A. 21-3711 through making of a false information. Counts 24 through 49 allege misdemeanor failure to maintain a record required to be kept by an abortion provider under K.S.A. 65-6703(b)(5). Counts 50 through 78 allege misdemeanor failure to determine fetal viability before performance of late-term abortions under K.S.A. 65-6703. Counts 79 through 107 allege misdemeanor unlawful performance of late-term abortions in violation of K.S.A. 65-6703. All of the counts in each group are identical from count to count except as to document numbers and patient numbers designed to identify the particular abortion that is the focus of each.

On October 19, 2007, Judge Anderson filed his sealed response to the *Morrison v. Anderson* petition. To justify his refusal to release Inquisition patient records to the Attorney General's office, Judge Anderson described his observations of the patient medical records produced by the two clinics, saying "returning evidence to CHPP and WHCS at this point in time would unacceptably increase the risk that the evidence could be lost, destroyed or compromised while active investigations and prosecutions are [ongoing]." He further stated that it appeared "KDHE reports [received from CHPP], which are required by law to be filed and maintained for five years, do not match copies obtained from KDHE." More-

over, he said that he had permitted Kline to keep copies of the CHPP patient records because they raised

"substantial factual and legal issues about CHPP compliance with the law . . . . The recent disclosures of possible false writings, which in context could mean that somebody may have committed a felony in an attempt to cover up a misdemeanor, convinces the District Court that no hasty decision should be made about management of the files which would risk loss or destruction of the as-filed redacted medical files of CHPP."

On October 24, 2007, this court appointed Chief District Judge David J. King of the First Judicial District to conduct an evidentiary hearing and produce a report containing recommended findings of fact for *Comprehensive Health*, the mandamus action focused on Kline's transfer of records. Specifically, Judge King was directed to obtain responses to 17 questions concerning Kline's handling of patient records. Judge King conducted a 5-day evidentiary hearing in November and December 2007. When given notice by Judge Anderson that he had been subpoenaed to testify in the Judge King proceeding, this court did not intervene to prevent or limit Judge Anderson's participation. In addition to Judge Anderson, witnesses at the hearing included Kline and certain of his subordinates. Judge King filed his report in *Comprehensive Health* on January 10, 2008.

*Hearing on Motion to Disqualify CHPP Counsel*

In this criminal prosecution, on January 16, 2008, then Chief Judge Stephen R. Tatum in Johnson County heard District Attorney Kline's motion to disqualify defense counsel Irigonegaray and Robert V. Eye. Although the motion is not in the record before us, a sealed transcript of the hearing is. Despite the sealing of the transcript, it is clear that the hearing was open to the public. For example, at one point Judge Tatum admonished Kline not to show an enlargement of a previously sealed document to members of the public in the gallery, including a person focusing a television camera. Kline called both Judge Anderson and Cavanaugh to testify at the hearing on the motion to disqualify.

The subpoena duces tecum directed to Judge Anderson to secure his testimony and the availability of certain documents at the hearing also is not in the record before us. But the hearing tran-

script again can be relied upon to identify at least some of the documents Judge Anderson brought to court that day. Among them were copies of KDHE reports produced by the agency in the Inquisition. Judge Anderson testified that these KDHE reports remained in the same form as when they were produced by the agency.

In addition, Judge Anderson brought copies of the patient records produced by CHPP in the Inquisition after our *Alpha* decision. He testified that there were particular pages within each record that CHPP represented to be copies of reports it submitted to KDHE on the patients' abortions. These pages were added to the redacted patient records after CHPP's initial document production in the Inquisition because special counsel Cavanaugh inquired about missing written determinations of fetal viability.

Kline attempted to introduce both the KDHE reports and the CHPP patient records into evidence during Judge Anderson's testimony, but CHPP objected to the documents becoming part of the public record of the case. Judge Tatum deferred ruling on the objection.

While Judge Anderson was on the witness stand, Kline also attempted to elicit testimony about Judge Anderson's mental process in overseeing the Inquisition, *e.g.*, why and how he had made probable cause determinations in anticipation of search warrants that were contemplated before the subpoenas were issued in the Inquisition. These lines of inquiry usually drew successful relevance objections from CHPP's lawyers. Judge Anderson testified without objection, however, that his contacts with Kline and his subordinates in the spring of 2007—*i.e.*, after Kline and Morrison traded positions but apparently before Judge Anderson told Kline and his subordinates that Judge Anderson would have no more interaction with the Johnson County District Attorney's office on the Inquisition—prompted Judge Anderson to make a comparison of the reports produced by KDHE and the CHPP-produced documents that had been described as copies of the KDHE reports. Judge Anderson testified that Kline had expressed concerns about what Kline viewed as over-redaction and possible manufacturing of documents that were then represented as authentic. Judge Anderson

then told Kline from the witness stand: "When you raised that issue, it was perceived by me as a very serious issue and I sought an independent evaluation of a part of the records to confirm whether there was a question that represented a real problem or not."

On further questioning by Kline, Judge Anderson reviewed particular pages of the CHPP patient records. He also reviewed an August 21, 2006, letter from Irigonegaray to Cavanaugh that described the particular pages as copies of KDHE reports earlier submitted to the agency by CHPP. It was this description as copies upon which Kline focused, apparently wishing to rely upon differences between the pages and the reports produced in the Inquisition by KDHE to support the felony charges in this criminal prosecution.

On cross-examination by CHPP counsel Eye, Judge Anderson testified that, despite the redactions in the CHPP patient records, an individual patient and her family members could still use the records to discern the identity of the patient. He also said that he had made no determination whether any alleged discrepancies in the records were the result of something counsel had done. Judge Anderson then elaborated on his earlier reference to his own independent investigation:

"[B]ecause of how [Kline and Morrison] were treating one another and all of the controversy surrounding this matter, I took it on myself to ask a detective from the police department in Topeka to do a windshield of . . . records . . . and give me an opinion as to whether the documents appeared to be photo copies [sic] of one another. She confirmed that there, was a question about the records and that it was appeared to be a photocopy of one another. So at that point in time, I just did nothing more because the two prosecutors had the information.

"What happened next in time was I had an opportunity to have a conversation with Veronica Dersch from Paul Morrison's office. She confirmed that she was aware of the questioned record issue. This was a conversation that I had down in Wichita during our judicial conference.

"Very quickly after that, Mr. Morrison declared that he was not going to do any further investigation of [CHPP], closed the investigation and represented publicly that there was no evidence of wrong doing [sic]. A few days after that he filed a motion to return the records of [CHPP] to [CHPP].

"Before I had an opportunity to even rule on that, I Mr. Irigonegaray came to my office, expecting to pick up the records. I said, 'Well, there's a problem with

the record.' And he looked confused. And I said, 'Let me show you.' And I showed three records and I said, 'These look like they are the same record and until this gets cleared up I am just going to sit tight on the records.' Mr. Irigonegaray left the office without the records. And then in a few days, it was probably two or three weeks later, Attorney General Morrison filed a mandamus action against me to try to disgorge me of the records.

"I had notified everyone that there was a questioned record. I had written a letter and . . . distributed it to Mr. Kline, Mr. Morrison, the disciplinary administrator, the Supreme Court Chief Justice and said there's a problem with these records[.] I am going to sit tight. And I sat down like an old mule and just was going to sit on that until everything was cleared up. And that's where we have been during the pendency of the mandamus. So I have made no determination that anybody did anything wrong.

"I have had a chance to review the records themselves and compare them with the records that were produced by the Kansas Department of Health and Environment, originally. These records that were produced by the Attorney General's office, or with the subpoenaed 609 records for the court's retention, do not match the records that are represented to be the KDHE reports that have been attached to the medical file that was reviewed by the physicians and used and relied on in their report to the court. That is the transaction as I recall it.

. . . .

"When I spoke to Mr. Irigonegaray, I pointed out there was a problem. And, you know, I have described this as he looked at me like my golden retriever does when he doesn't understand. He looked surprised. And I have known him for 25 years and truly he was surprised. He said, 'You're unpredictable.' And as a judge, you don't like to be called unpredictable because you like to be very deliberate about your rulings.

"I have known him for so long, I did what I probably should not have done, but for the relationship, I pulled these records from the file and I said, 'Pedro, look at these records. There is a problem.' And I said, Mr. Morrison probably shouldn't have written that clearance letter like he did.' Mr. Irigonegaray said, 'It looks like this is going to last for a while.' And I said, 'Yeah.' And that was the end of the conversation.

"I have not tried to make a determination as to whether the lawyers cooked the books. I've known you too long. You wouldn't do that. I don't know what happened in this production. But I do know that these records and the records that were produced with the medical record are not the same."

Kline called special counsel Cavanaugh as his next witness in the hearing on the motion to disqualify defense counsel in this criminal prosecution. Cavanaugh described his role in the Inquisition and said that, once CHPP had made agreed-upon redactions in its patient records pursuant to *Alpha*, it produced the records to the

district court in June 2006. Judge Anderson then placed the records in the custody of Cavanaugh, who reviewed them with two physicians appointed by Judge Anderson. This review resulted in Cavanaugh's August 2006 contacts with CHPP counsel to inquire about missing written findings on fetal viability in certain records. Cavanaugh testified about these contacts and the correspondence evidencing the exchange, including statements to him by CHPP counsel Eye that such findings were documented on the KDHE reports submitted to the agency by CHPP. According to Cavanaugh, Eye also told him that the reports were kept separate from patient records in a secure file, and he and Eye agreed that CHPP would send copies of them to Cavanaugh. Once that was done via the August 21, 2006, letter from Irigonegaray to Cavanaugh, Cavanaugh ensured that the new pages were inserted into the patient records by matching patient numbers.

This testimony was followed by a flurry of objections related to Kline's alleged use of the hearing to create premature publicity on his theories of prosecution. In response, Kline asserted that he was trying to demonstrate that the representations made by Eye and Irigonegaray went to the heart of the State's case on missing written documentation of fetal viability determinations and on whether CHPP had engaged in felony making of false writings by manufacturing "copies" of KDHE reports in response to Cavanaugh's questions. Kline argued that Irigonegaray's letter enclosing the additional pages from CHPP was not a mere transmittal letter:

"It doesn't say here are the documents you requested. It says here are documents that are copies of original filings with the Kansas Department of Health and Environment. And that is not the case. It also claims that these documents are needed as a demonstration of non-viability. That goes to the crux of this State's case in the entirety of its complaint against [CHPP]. We allege that those documents are false information. There are specific references to the nature and how these documents were prepared and maintained by counsel. Certainly, stipulations are available. But the State has the right to pursue this evidence."

In addition to identifying the series of August 2006 letters between himself and CHPP counsel, Cavanaugh testified about the contents of a September 10, 2007, affidavit executed by him, which described CHPP's production of patient records. The affidavit in-

cluded the statement that the patient records originally produced "did not have a documented referral from a physician nor a finding that the fetus was not viable." After CHPP counsel were permitted to gather the additional reports from their client and convey them to Cavanaugh, the omissions were cured, Cavanaugh said, and it was his "understanding and that of the physicians reviewing the records . . . the copies of pages . . . provided to us by . . . Irigonegaray were in fact photocopies of the page[s] from the actual report[s] filed with the Kansas Department of Health and Environment for each respective file."

As with Judge Anderson, the record before us does not contain a copy of the subpoena duces tecum directed at Cavanaugh to secure his testimony and certain documents at the hearing on the motion to disqualify defense counsel. However, it is apparent from the transcript that he had brought copies of his August 2006 correspondence with CHPP counsel and his September 10, 2007, affidavit with him when he came to court.

At the conclusion of Cavanaugh's direct examination, Kline again offered for admission the State's exhibits that had been reviewed with Judge Anderson and Cavanaugh. On defense objection, Judge Tatum again deferred his ruling.

When CHPP counsel declined to cross-examine Cavanaugh, Kline announced that he had no further witnesses on the motion, and counsel were permitted to make their arguments.

Kline again repeated the State's theory of prosecution on the 23 felony counts in the complaint, as well as his reasons for believing that CHPP counsel Eye and Irigonegaray would be State witnesses:

"[CHPP] provided documents pursuant to subpoena and represented them to be copies of original documents filed with the Kansas Department of Health and Environment . . . and . . . those documents are not, in fact, actual copies of the original files but were manufactured pursuant to that subpoena.

. . . .

"[T]he State will provide evidence at trial that the records produced pursuant to subpoena are copies of the very same document over and over.

. . . .

". . . But the State does not want a motion after trial claiming a conflict [between CHPP and its counsel] when the State intends to call their counsel as witnesses. So a waiver on the record with full knowledge is important.

"[T]hey are material witnesses to a largely disputed fact. You heard the dispute here today."

Judge Tatum denied Kline's motion to disqualify. Most important for purposes of this appeal, the judge also ordered that all of the exhibits marked and/or offered by Kline be returned to the person who brought them to court for the hearing. Thus none of the documents referenced by Judge Anderson and Cavanaugh during their testimony became a part of the public record of this criminal prosecution at that time. Judge Tatum emphasized that, at the conclusion of the hearing, Judge Vano's seal order remained in place.

Two weeks later, on January 31, 2008, Steve Six was sworn in as Morrison's successor in the Attorney General's office.

*Preliminary Hearing Subpoenas and This Court's Protective Order*

As an April 7 and 8, 2008, setting for the preliminary hearing in this criminal prosecution approached, Kline issued another subpoena duces tecum to Judge Anderson. The subpoena required Judge Anderson to bring with him all KDHE reports produced in the Inquisition; 29 CHPP patient records produced in the Inquisition; a Cavanaugh affidavit for which no date was given; eight pieces of correspondence between Cavanaugh and CHPP lawyers from May, June, and August 2006; Judge Anderson's Memorandum Decision dated April 18, 2007; and one of his July 13, 2007 letters, presumably the one written to Kline and Morrison that dealt with CHPP's patient records.

On March 24, 2008, also in preparation for the preliminary hearing, Kline issued a subpoena duces tecum to Dr. Elizabeth Saadi, KDHE's Interim Director for the Center for Health and Environmental Statistics. It called for her testimony and required her to bring to court certified copies of KDHE reports filed with the agency by CHPP regarding 23 of the 29 abortion patients whose records had been obtained from CHPP. KDHE filed an objection and motion to quash the subpoena 4 days later, arguing that it was prevented from producing the reports filed with it by CHPP because K.S.A. 65-445 forbade disclosure to the Johnson County District Attorney.

On April 2, 2008, the eve of the hearing on KDHE's motion, Kline faxed two additional subpoenas to KDHE. Each was titled "duces tecum" but did not list any documents to be brought to the preliminary hearing by the witness. One was directed to KDHE's records custodian and one to KDHE Chief of Vital Statistics Data Analysis Gregory Crawford.

The record before us contains an unsealed transcript of the April 3, 2008, hearing on KDHE's motion to quash before Judge Tatum. KDHE, Kline, and CHPP agreed at the hearing's outset that Judge Tatum and the parties also could take up the two later subpoenas faxed to KDHE as part of the motion hearing. Kline clarified that the two later subpoenas were intended to call for testimony only, despite their duces tecum labels.

At the hearing, the lawyer for the KDHE said that no witness from the agency could authenticate the KDHE reports produced by the agency in the Inquisition as true and correct copies of the reports submitted to the agency by CHPP without doing a comparison of the two sets of documents. The agency was unwilling to do such a comparison unless ordered to do so because of the limitations of K.S.A. 65-445.

For his part, Kline asserted during the hearing that he had no need for the documents listed in the Saadi subpoena because he already had them; rather, he only needed Saadi to authenticate his set as true and correct copies of the reports submitted to the agency by CHPP. Kline represented that the two later subpoenas to the KDHE records custodian and Crawford were intended to obtain testimony that KDHE complied with his request for documents in the Inquisition. Kline argued that nothing prevented him from sharing the KDHE reports he had gathered under K.S.A. 65-445 as Attorney General with other law enforcement agents or prosecutors, including himself as Johnson County District Attorney. He also argued that he could put the produced documents into evidence in this criminal prosecution through an investigator or Judge Anderson.

Judge Tatum took the KDHE motion to quash under advisement. He also continued the preliminary hearing previously set for April 7 and 8 until May 27 and 28, 2008.

Meanwhile, on the same day as the motion to quash hearing before Judge Tatum, Judge Anderson filed a Notice of Collateral Proceedings and Receipt of Subpoena for Records in *Morrison v. Anderson*, the case in this court seeking Judge Anderson's surrender of Inquisition documents. Judge Anderson attached a copy of the subpoena issued by Kline for the April 7 and 8 preliminary hearing. The same day, Six learned of the preliminary hearing subpoena and filed an emergency motion for protective order in *Morrison v. Anderson*. Six sought further court control of records but did not ask this court to stop Judge Anderson from testifying at the preliminary hearing in this criminal prosecution.

On April 4, 2008, unaware of Judge Anderson's and Cavanaugh's January 2008 testimony in the hearing on the motion to disqualify CHPP counsel, and unaware that the January 7-8 preliminary hearing had been continued the previous day by Judge Tatum, this court issued a protective order in *Morrison v. Anderson*. We directed Judge Anderson to safeguard exclusive possession of "inquisition records maintained by him" and not to appear as a witness in this criminal prosecution "until further order of this court."

On April 18, 2008, after Judge Anderson had received our April 4 protective order in *Morrison v. Anderson*, he issued a similar protective order under the Inquisition case number so that Cavanaugh would not be forced to testify or produce documents for the preliminary hearing in this criminal prosecution. We have neither information in the record before us nor statements or arguments from counsel concerning how Judge Anderson had continuing jurisdiction in the Inquisition, which the Attorney General had purported to close the previous summer.

Also on April 18, 2008, Judge Anderson gave written notice via letter to Kline of our April 4, 2008, protective order in *Morrison v. Anderson*. On April 21, 2008, Kline nevertheless issued a new subpoena duces tecum to Judge Anderson to appear and produce documents at the continued preliminary hearing in this criminal prosecution on May 27 and 28, 2008. The subpoena commanded Judge Anderson to bring with him (1) copies of any and all KDHE report forms regarding the Inquisition; (2) copies of the 29 patient records from CHPP; (3) a copy of his April 18, 2007, Memorandum

Decision; and (4) a copy of one of his July 13, 2007, letters, again apparently the one of the two dealing with CHPP.

Also on April 21, 2008, Kline filed in this criminal prosecution an unsealed and untimely Response to the KDHE motion to quash that had been heard on April 3; he did not serve the Response on the other parties, and there is no explanation on the record before us for this violation of Supreme Court and local court rules. Kline argued that K.S.A. 65-445 should not be construed to prevent him from getting the documents listed in the subpoena because the statute would then prevent exactly the enforcement of abortion regulation that the legislature intended to allow. He also asserted, apparently referring to Judge Anderson's and Cavanaugh's testimonies at the January 16 hearing on the State's motion to disqualify, that he had already demonstrated the relevance of the documents and the seriousness of the issue.

The next day, April 22, 2008, Kline issued a subpoena duces tecum to Cavanaugh. It commanded that Cavanaugh bring with him to the continued preliminary hearing on May 27 and 28, 2008, (1) his September 10, 2007, affidavit; (2) a copy of Eye's letter to him dated August 14, 2006; (3) a copy of his letter to Eye dated August 15, 2006; and (4) a copy of Irigonegaray's letter to him, dated August 21, 2006.

On April 24, 2008, Judge Tatum held another hearing in this criminal prosecution, this time on defendant CHPP's motions to strike, to have Kline held in contempt, and to dismiss. The motions were prompted by Kline's attachment of Judge Anderson's April 18, 2007, Memorandum Decision, which CHPP believed to be sealed in the Inquisition, to Kline's April 21 Response to KDHE's motion to quash, as well as the Kansas City newspaper's subsequent publication of information contained in the Memorandum Decision. Judge Tatum, had, during the April 3 hearing, declined Kline's invitation to review that Memorandum Decision and had placed the copy offered to him by Kline, unread, in a sealed envelope; Judge Tatum also had declined Kline's offer to contact Judge Anderson to check on the sealed or unsealed status of the Memorandum Decision. Judge Tatum denied CHPP's motions, instead reinforcing Judge Vano's seal order and directing the par-

ties to deliver copies of anything to be filed in the clerk's office first to his chambers for review.

On April 28, 2008, Judge Tatum issued a written order quashing the March 24 preliminary hearing subpoena duces tecum to Saadi. Although the parties had agreed to take up the two later KDHE subpoenas, *i.e.*, those to the records custodian and Crawford, at the April 3 hearing on KDHE's motion to quash, Judge Tatum's order did not address either.

A little over one week later, on May 2, 2008, this court unsealed portions of the record and court file in *Comprehensive Health* and *Morrison v. Anderson*. Also, believing that Judge Anderson had given Attorney General Six and his subordinates access to the entire Inquisition file by then, this court issued an Order to Show Cause why *Morrison v. Anderson* should not be dismissed. Our May 2 order also continued our April 4 protective order in force, save an amendment to permit Six to respond to discovery requests in the Tiller case.

On May 8, 2008, KDHE filed a motion to clarify Judge Tatum's April 28 order in this criminal prosecution, seeking a ruling on whether the subpoenas to its records custodian and Crawford also had been quashed.

On May 16, 2008, Judge Anderson filed a motion for protective order in this criminal prosecution on behalf of himself and Cavanaugh.

Five days later, in this criminal prosecution, Kline filed a motion to reconsider and/or clarify Judge Tatum's order quashing Saadi's subpoena. He also filed a motion to intervene in *Morrison v. Anderson* in this court, arguing that his motion was timely because he had just become aware of the April 4 protective order when portions of the record in that case were unsealed. This statement was inconsistent with the date of Judge Anderson's letter to Kline. Kline's motion to intervene also inaccurately asserted that before May 7, 2008, he had not been "previously noticed or made aware of the nature of any proceedings" in *Morrison v. Anderson*. Kline had actually been served with a motion to consolidate *Comprehensive Health* and *Morrison v. Anderson* in September 2007. As support for intervention, Kline also included arguments on the merits

of this criminal prosecution, invoking Judge Anderson's earlier expressed opinions and Cavanaugh's September 10, 2007, affidavit. Kline also argued that our April 4 protective order conflicted with our October 5, 2007, protective order entered in *Comprehensive Health*, which made an exception to dissemination of clinic patient records for the pursuit of a law enforcement investigation or court proceeding.

Kline responded to Judge Anderson's motion for protective order in this criminal prosecution on May 27, 2008. He again based the bulk of his arguments on opinions Judge Anderson had expressed about the merits of the case against CHPP, as well as special counsel Cavanaugh's statements regarding missing viability determinations and reliance on CHPP counsel's description of the documents transmitted to Cavanaugh in late August 2006. As part of his effort to rely on Judge Anderson's expressions of opinion on the quality of Kline's evidence, Kline also mentioned that Judge Anderson had already testified at the January 16, 2008, motion to disqualify hearing and that Judge Anderson had shown the documents gathered by Kline to a Topeka police expert. Support for the Johnson County felony charges, Kline asserted, "simply" required "a comparison of the original [KDHE reports] and the . . . reports that criminal defendant claimed w[ere] kept 'in a separate secure file' and . . . were actual copies of the original report filed with KDHE." He further contended that the Johnson County misdemeanor charges were supported by the lack of viability determinations and emergency findings in the patient medical records produced by CHPP in the Inquisition.

Also on May 27, 2008, Judge Tatum heard KDHE's motion to clarify, Kline's motion for reconsideration, and Judge Anderson's motion for protective order in this criminal prosecution. The transcript of this hearing is unsealed in the record before us. A Kline representative argued at the hearing that the subpoenas to the KDHE records custodian and Crawford were intended to bring witnesses to the preliminary hearing to testify generally about how KDHE reports are received and maintained and how the agency adds any markings to them. He said that the State also "theoretically" would have KDHE representatives compare the documents

obtained from KDHE in the Inquisition and testify whether they are the same as the documents filed with KDHE by CHPP. Judge Tatum questioned whether KDHE personnel would be able to testify to that fact without having the originals of the reports in front of them and characterized a subpoena asking them to bring reports submitted by CHPP and KDHE for purposes of comparison as having a distinction without a difference from a subpoena asking them to bring such reports for admission into evidence.

Counsel for Judge Anderson, and, by extension, Cavanaugh, relied on this court's April 4, 2008, protective order. In response, Kline argued that the April 4 protective order should not control because testifying posed no undue burden and impaired no privilege. In addition, Kline said, Judge Anderson had already testified in the January hearing on the motion to disqualify CHPP's counsel and Judge Anderson's testimony on the KDHE reports was necessary because of the opinions he had expressed on that evidence. Counsel for CHPP objected that Judge Anderson could not serve as an expert witness on his client's culpability, a position with which counsel for Judge Anderson agreed. Judge Tatum asked Kline to explain Judge Anderson's role in the prosecution's case against CHPP. Kline responded that Judge Anderson would "not authenticate, necessarily." And he again, provoking repeated objections, recited Judge Anderson's previously expressed opinions on the quality of Kline's evidence. Finally, Judge Tatum heard the remainder of Kline's proffer on why Judge Anderson and Cavanaugh could provide relevant evidence in this criminal prosecution at the bench and on a sealed record not included in the transcript in the record on appeal.

At the conclusion of the hearing, Judge Tatum ruled that this court's April 4 protective order in *Morrison v. Anderson*

"does not say that Judge Anderson is never to be a witness over here. It says he is not to appear . . . until further order of the court. . . .

. . . .

"[W]e have set the prelim hearing over. When we will get a ruling, a decision or when there's a further order of Supreme Court, I can't say. But we will wait for that.

" . . . I will follow that order. At this time I will quash the subpoenas for Judge Anderson and Mr. Cavanaugh . . . for the information requested and for their

testimony as requested at this time. When we get further direction from the Supreme Court then we will proceed accordingly."

On June 2, 2008, Judge Tatum signed an order quashing the subpoenas to the KDHE records custodian and Crawford. He also denied Kline's motion for reconsideration of his earlier decision on the Saadi subpoena.

The next day, Six filed his Response opposing Kline's motion to intervene in this court's *Morrison v. Anderson* case. He pointed out several misstatements in Kline's motion and argued that it was untimely. Six pointed out that his motion for protective order had not sought to prevent Judge Anderson's testimony in the preliminary hearing in this criminal prosecution, only to prevent further distribution of patient medical records by Kline. Six also argued that Kline's intervention motion was insufficient because of its failure to attach a pleading setting forth the claim or defense for which Kline sought to intervene. Judge Anderson endorsed Six' arguments against Kline's intervention through a Response filed June 6, 2008.

Also on June 6, 2008, Kline filed his Notice of Interlocutory Appeal to the Court of Appeals in this criminal prosecution, challenging Judge Tatum's order "suppressing evidence and enjoining any person from the Kansas Department of Health and Environment from testifying about any topic entered on May 27, 2008."

This court denied Kline's motion to intervene in *Morrison v. Anderson* on July 3, 2008.

*Court of Appeals Show Cause and Transfer to This Court*

Later in July, the Court of Appeals ruled after a show cause proceeding that its jurisdiction over the appeal in this criminal prosecution extended only to Judge Tatum's rulings arising from the May 27, 2008, hearing. At the time, the Court of Appeals understood this to mean it could review only the rulings on the two later KDHE subpoenas. At the Court of Appeals suggestion, on August 7, 2008, Kline's office filed a pleading demonstrating that Judge Tatum also had ruled on the subpoenas to Judge Anderson and Cavanaugh as part of the May 27, 2008, hearing. Kline did not, however, take issue with the Court of Appeals' decision that it

lacked jurisdiction over the Saadi subpoena. The brief of appellant, filed in this criminal prosecution on September 9, 2008, also did not challenge this aspect of the appellate jurisdiction decision.

This court transferred this interlocutory appeal from the Court of Appeals on December 22, 2008.

On January 29, 2009, while this interlocutory appeal was awaiting a May 2009 oral argument, this court dismissed *Morrison v. Anderson*. The dismissal order was silent on the status of the April 4, 2008, protective order that had been entered in that case. At oral argument before this court, counsel from the Johnson County District Attorney's office, where Kline had been replaced by Stephen M. Howe, said he did not know whether the April 4 protective order remained in effect.

## DISCUSSION

In order to begin our analysis of Judge Tatum's rulings on the subpoenas for witnesses to appear and bring documents to the preliminary hearing in this criminal prosecution, we must first consider the felony charges brought by the State and the legal theories the State has advanced to support them.

For Counts 1 through 23, the only felony counts, the State appears to rely entirely on what Judge Anderson and Cavanaugh understood defense counsel Irigonegaray to say in his letter when producing documentation of CHPP's written determinations of fetal viability. The charges hinge on Irigonegaray's description of the items as copies of reports submitted previously by CHPP to KDHE. The State hopes to demonstrate that the documents are not in fact copies of the KDHE reports by comparing them to the reports in the KDHE's files, and it suggests that the "copies" produced by CHPP may have been created only after special counsel Cavanaugh raised an issue about their absence. For this reason, the State needs authenticated copies of the reports filed by CHPP as they exist in KDHE's files, which it will then compare to the items produced by CHPP to Cavanaugh.

It is also important to note, as an initial matter, that a typical inquisition does not lead to the supervising district judge becoming a custodian of documents produced in response to subpoenas. In

the ordinary case, a district judge merely authorizes certain investigative tools, *e.g.*, subpoenas or search warrants; and any documents or other physical evidence gathered through use of those tools are deposited with the prosecutor or law enforcement agencies. Given the unique character of Kline's abortion-related inquiry, and possibly prompted in part by the safeguards put in place by this court in its *Alpha* decision, Judge Anderson did become the custodian of certain documents produced in the Inquisition leading to this criminal prosecution, including the redacted patient records produced by CHPP and, apparently, the reports submitted by CHPP to KDHE and then produced by KDHE. We note in passing that there appear to have been breaks in Judge Anderson's custody. For example, on October 24, 2006, Kline's staff was permitted to take the clinic patients' redacted records from Judge Anderson and make copies. At another point, Morrison's staff was permitted to do likewise. But we are not asked to address the significance of those breaks in this appeal, and we do not do so.

*Saadi Subpoena Duces Tecum*

The Saadi subpoena duces tecum called for her testimony as well as the production of certified copies of 23 KDHE reports of induced pregnancy termination pertaining to the patients whose abortions are the subject of the felony counts in the complaint.

Consideration of the subpoena duces tecum directed to Saadi requires us first to discuss the scope of our jurisdiction in this interlocutory appeal. Neither party discusses jurisdiction in its brief. However, it is the responsibility of this court to consider the issue *sua sponte*, if necessary. *State v. Gill*, 287 Kan. 289, 294, 196 P.3d 369 (2008).

As the Court of Appeals observed before transfer, the Notice of Interlocutory Appeal in this criminal prosecution was insufficient to create appellate jurisdiction over the Saadi subpoena because it came too late. The State's pleading filed August 7, 2008, in response to the Court of Appeals' order to show cause was sufficient to demonstrate the existence of appellate jurisdiction over the subpoenas directed at Judge Anderson and Cavanaugh but not over that directed to Saadi. Thus, although counsel for both parties ap-

peared to assume the existence of such jurisdiction at oral argument before this court, we do not reach the merits of either side's arguments on the Saadi subpoena duces tecum. Judge Tatum's ruling on that subpoena stands undisturbed.

*Crawford and KDHE Records Custodian Subpoenas*

These two later KDHE subpoenas require us to address three preliminary points.

First, the State's Notice of Interlocutory Appeal was timely and specific enough to create appellate jurisdiction over the Crawford and KDHE records custodian subpoenas. The State's Notice of Interlocutory Appeal was filed on June 6, 2008, within 10 days of the May 27, 2008, hearing before Judge Tatum and explicitly referenced that hearing.

Second, as mentioned above, the subpoenas to Crawford and the KDHE records custodian were titled "Subpoena Duces Tecum" but listed no documents to be brought to court. In addition, Kline assured Judge Tatum that the titles of the subpoenas were in error and that they were not meant to command the production of documents by either witness.

Third, some of the topics on which Kline intended to have these witnesses testify are clear and some less so. It is clear that the State wished to call Crawford and the records custodian to testify generally to the agency's practices regarding reports submitted by abortion providers such as CHPP, presumably including the forms used and other information about means of submission and storage. Kline and one of the other attorneys from his District Attorney's office also represented that the State would put on evidence from these witnesses about any markings made on the reports by agency employees. Kline also wanted testimony from a KDHE witness to show that KDHE responded to the Inquisition during his term as Attorney General by producing copies of reports submitted by CHPP on the 23 abortions underlying the felony counts in the complaint.

It is somewhat less clear from the record before us whether Kline also intended to use these two subpoenas to secure testimony comparing the reports as they currently exist in KDHE's files, *i.e.*,

those called for in the Saadi subpoena, to those Kline obtained from KDHE in the Inquisition, *i.e.*, those called for in the subpoena to Judge Anderson. It is also somewhat less clear whether Kline also intended to use the two later KDHE subpoenas to obtain testimony on the comparison between one or both of the sets of reports from KDHE to the reports as produced in the Inquisition by CHPP, once Cavanaugh inquired about written determinations of fetal viability. From the record before us, it is certain Kline intended to get comparison testimony from Saadi. And it is evident that Judge Tatum believed this to be one of Kline's goals with the two other KDHE witnesses as well. In addition, at oral argument before this court, counsel for the State asserted that Saadi and a KDHE records custodian would serve the same evidentiary purposes for the State. In the discussion below, we therefore assume that Kline intended, and the State still intends, to use Crawford and/or the KDHE records custodian to compare sets of documents, one of which consists of CHPP reports as they currently exist in KDHE's files.

The statute governing Judge Tatum's evaluation of the motion to quash filed by KDHE is K.S.A. 60-245(c)(3)(A), which reads in pertinent part: "On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it: . . . (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies."

Neither KDHE nor CHPP has claimed that the reports as they currently exist in KDHE's files or their contents are privileged. However, both have argued that the reports and their contents are "other protected matter" because they are covered by K.S.A. 65-445. That statute states in pertinent part:

"(a) Every medical care facility shall keep written records of all pregnancies which are lawfully terminated within such medical care facility and shall annually submit a written report thereon to the secretary of health and environment in the manner and form prescribed by the secretary. . . .

"(b) Each report required by this section shall include the number of pregnancies terminated during the period of time covered by the report, the type of medical facility in which the pregnancy was terminated, information required to be reported under K.S.A. 65-6703 and amendments thereto if applicable to the pregnancy terminated, and such other information as may be required by the

secretary of health and environment, but the report shall not include the names of the persons whose pregnancies were so terminated.

"(c) Information obtained by the secretary of health and environment under this section shall be confidential and shall not be disclosed in a manner that would reveal the identity . . . of any medical care facility which submits a report to the secretary under this section, except that such information, including information identifying such persons and facilities may be disclosed to the state board of healing arts upon request of the board for disciplinary action conducted by the board and may be disclosed to the attorney general upon a showing that a reasonable cause exists to believe that a violation of this act has occurred. Any information disclosed to the state board of healing arts or the attorney general pursuant to the subsection shall be used solely for the purposes of a disciplinary action or criminal proceeding. Except as otherwise provided in this subsection, information obtained by the secretary under this section may be used only for statistical purposes and such information shall not be released in a manner which would identify any county or other area of this state in which the termination of the pregnancy occurred. A violation of this subsection (c) is a class A nonperson misdemeanor.

. . . .

"(e) For the purpose of maintaining confidentiality as provided by subsections (c) and (d), reports of terminations of pregnancies required by this section shall identify the . . . facility submitting such reports only by confidential code number assigned by the secretary of health and environment to such . . . facility and the department of health and environment shall maintain such reports only by such number."

## K.S.A. 65-6703, referenced by K.S.A. 65-445(b), makes the performance of certain abortions illegal and outlines specific reporting and record-keeping obligations:

"(a) No person shall perform or induce an abortion when the fetus is viable unless such person is a physician and has a documented referral from another physician not legally or financially affiliated with the physician performing or inducing the abortion and both physicians determine that: (1) The abortion is necessary to preserve the life of the pregnant woman; or (2) a continuation of the pregnancy will cause a substantial and irreversible impairment of a major bodily function of the pregnant woman.

"(b)(1) Except in the case of a medical emergency, prior to performing an abortion upon a woman, the physician shall determine the gestational age of the fetus according to accepted obstetrical and neonatal practice and standards applied by physicians in the same or similar circumstances. If the physician determines the gestational age is less than 22 weeks, the physician shall document as part of the medical records of the woman the basis for the determination.

"(2) If the physician determines the gestational age of the fetus is 22 or more weeks, prior to performing the abortion upon the woman the physician shall de-

termine if the fetus is viable by using and exercising that degree of care, skill and proficiency commonly exercised by the ordinary skillful, careful and prudent physician in the same or similar circumstances. In making this determination of viability, the physician shall perform or cause to be performed such medical examinations and tests as are necessary to make a finding of the gestational age of the fetus and shall enter such findings and determinations of viability in the medical record of the woman.

(3) If the physician determines the gestational age of a fetus is 22 or more weeks, and determines that the fetus is not viable and performs an abortion on the woman, the physician shall report such determinations and the reasons for such determinations in writing to the medical care facility in which the abortion is performed for inclusion in the report of the medical care facility to the secretary of health and environment under K.S.A. 65-445 and amendments thereto or if the abortion is not performed in a medical care facility, the physician shall report such determinations and the reasons for such determinations in writing to the secretary of health and environment as part of the written report made by the physician to the secretary of health and environment under K.S.A. 65-445 and amendments thereto.

(4) If the physician who is to perform the abortion determines the gestational age of a fetus is 22 or more weeks, and determines that the fetus is viable, both physicians under subsection (a) determine in accordance with the provisions of subsection (a) that an abortion is necessary to preserve the life of the pregnant woman or that a continuation of the pregnancy will cause a substantial and irreversible impairment of a major bodily function of the pregnant woman and the physician performs an abortion on the woman, the physician who performs the abortion shall report such determinations, the reasons for such determinations and the basis for the determination that an abortion is necessary to preserve the life of the pregnant woman or that a continuation of the pregnancy will cause a substantial and irreversible impairment of a major bodily function of the pregnant woman in writing to the medical care facility in which the abortion is performed for inclusion in the report of the medical care facility to the secretary of health and environment under K.S.A. 65-445 and amendments thereto or if the abortion is not performed in a medical care facility, the physician who performs the abortion shall report such determinations, the reasons for such determinations and the basis for the determination that an abortion is necessary to preserve the life of the pregnant woman or that a continuation of the pregnancy will cause a substantial and irreversible impairment of a major bodily function of the pregnant woman in writing to the secretary of health and environment as part of the written report made by the physician to the secretary of health and environment under K.S.A. 65-445 and amendments thereto.

(5) The physician shall retain the medical records required to be kept under paragraphs (1) and (2) of this subsection (b) for not less than five years and shall retain a copy of the written reports required under paragraphs (3) and (4) of this subsection (b) for not less than five years.

. . . .

"(d) . . . Notwithstanding any provision of this section, a person shall not perform an abortion that is prohibited by law.

"(e) As used in this section, 'viable' means that stage of fetal development when it is the physician's judgment according to accepted obstetrical or neonatal standards of care and practice applied by physicians in the same or similar circumstances that there is a reasonable probability that the life of the child can be continued indefinitely outside the mother's womb with natural or artificial life-supportive measures.

. . . .

"(g) Upon a first conviction of a violation of this section, a person shall be guilty of a class A nonperson misdemeanor. Upon a second or subsequent conviction of a violation of this section, a person shall be guilty of a severity level 10, nonperson felony."

Interpretation of a statute is a question of law over which this court has unlimited review. *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010). The most fundamental rule is that the intent of the legislature governs if that intent can be ascertained. *Arnett*, 290 Kan. at 47. An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *State v. Raschke*, 289 Kan. 911, 914, 219 P.3d 481 (2009). When a statute is plain and unambiguous, an appellate court does not speculate as to the legislative intent behind it and will not read into the statute something not readily found in it. Where there is no ambiguity, the court need not resort to statutory construction. Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history or other background considerations to construe the legislature's intent. *State v. Trautloff*, 289 Kan. 793, 796, 217 P.3d 15 (2009). This court cannot delete vital provisions or supply vital omissions in a statute. No matter what the legislature may have really intended to do, if it did not in fact do it, under any reasonable interpretation of the language used, the defect is one that the legislature alone can correct. See *State v. Johnson*, 289 Kan. 870, 879, 218 P.3d 46 (2009).

The relevant text of K.S.A. 65-445(c) is unambiguous. It tells us plainly that any disclosure of the reports filed by CHPP in the form they currently exist in KDHE's files or of their contents is strictly

limited to two recipients, the Board of Healing Arts and the Attorney General. The party now seeking disclosure of the reports or their content is the Johnson County District Attorney rather than the Board of Healing Arts or the Attorney General. In our view, the plain statutory limitation on disclosure in K.S.A. 65-445(c) makes the information it covers "other protected matter" under K.S.A. 60-245(c)(3)(A)(iii).

We also note that K.S.A. 65-445(c) sets up a condition for disclosure to the Attorney General. He or she must show "that a reasonable cause exists to believe that a violation *of this act* has occurred." (Emphasis added.) This condition would have controlled the appropriateness of KDHE's disclosure in Kline's Inquisition during his term as Attorney General. That disclosure is not before us in this action, and we pass no judgment on it.

The statute also sets up strict parameters on the use to which disclosed reports or contents of reports can be used. Such information "shall be used solely for the purposes of a disciplinary action or criminal proceeding." The KDHE Secretary may also use the information in its statistical reports. The statute does not state that the Attorney General is the only prosecutor entitled to use properly disclosed KDHE reports or their contents in the pursuit of criminal justice. To the extent CHPP has urged us to read this additional restriction into the statute here, we decline to do so. Counsel for the State is correct that the legislature is able to design a statute to limit a prosecutor's jurisdiction, and it did not do so in K.S.A. 65-445.

In addition, the disclosure language in the statute is more restrictive than the use language. Disclosure to the Attorney General is conditioned on a showing of reasonable cause to believe that a violation of Chapter 65 occurred, while use of properly disclosed reports is permitted in a criminal proceeding, apparently including prosecutions of crimes beyond those defined in Chapter 65.

Although our analysis could end here, we note possible support for our plain-language conclusion from two other lines of argument mentioned by the parties over the course of this criminal prosecution.

First, events during the 2008 legislative session may have significance. Both houses approved legislation to amend K.S.A. 65-445(c) to permit disclosure of KDHE reports such as those under consideration here to county and district attorneys. See H. Sub. for S.B. 389 (2008) (enrolled and presented April 11, 2008). The amendment would have become law but for the Governor's veto and a failure to override it. See Sen. J., April 30, 2008, p. 2023 (message from the Governor vetoing S.B. 389); Sen. J., April 30, 2008, p. 2043 (Senate unable to override veto). Because we presume that a legislative alteration of statutory language makes a substantive change in the law, see *State v. Preston*, 287 Kan. 181, 184, 195 P.3d 240 (2008), we could make the further assumption that the 2008 legislature believed it necessary to state explicitly that a district attorney could obtain release of KDHE reports in order for the statute to allow it. The counterargument is that courts should avoid reading too much into legislative inaction.

Second, contrary to the oral argument of the State, the Kansas Open Records Act's treatment of the type of KDHE reports at issue here is consistent with our limitation on their dissemination. The Act sets out an exception permitting agency refusal to disclose these reports to unauthorized persons. See K.S.A. 45-221(a). That exception, which had been due to expire in July 2010, see K.S.A. 2009 Supp. 45-229(i), was instead extended to July 2015 during the 2010 legislative session. See L. 2010, ch. 112, sec. 3.

K.S.A. 65-445(c) compels us to conclude that Judge Tatum's ruling quashing the subpoenas directed to Crawford and the KDHE records custodian must be affirmed in part and reversed in part.

To the extent the State wishes to call these persons to the stand as fact witnesses on general practices of the agency regarding reports such as those filed by CHPP, it should be permitted to do so. Such testimony does not disclose either the reports themselves or their contents. To the extent the State wishes to call these persons to testify on additional facts about the agency's response in the Inquisition, *i.e.*, that it received a subpoena or request of some sort that appeared to be in compliance with the statutory condition or was otherwise unchallenged, and that it produced reports to

Kline as Attorney General, that type of testimony also is permissible. Again, such testimony does not disclose either the reports themselves or their contents, with the possible exception of CHPP's code number, which has already been discussed in open court.

In contrast, neither Crawford nor the KDHE records custodian can be permitted to testify in a way that, as Judge Tatum put it, "accomplishes indirectly what cannot be accomplished directly" under K.S.A. 65-445. The statute prevents these witnesses from making what is effectively a disclosure of the KDHE reports filed by CHPP as they currently exist in the agency's files by bringing the reports to court in a district attorney's prosecution. It also prevents these witnesses from doing a physical comparison of the KDHE reports filed by CHPP as they currently exist in the agency's files in order to testify that they are the same as or different from another set of documents. Likewise, these witnesses are not permitted to testify from memory on the contents of the KDHE reports filed by CHPP as they currently exist in the agency's files.

*Judge Anderson Subpoena Duces Tecum*

As outlined above, Judge Anderson's subpoena duces tecum called for his testimony as well as the production of several items that came into his possession or were created by him because of the Inquisition: (1) the reports submitted by CHPP to KDHE and produced by the agency during the Inquisition; (2) the CHPP patient records produced by the clinic during the Inquisition; (3) Judge Anderson's Memorandum Decision dated April 18, 2007; and (4) one of Judge Anderson's July 13, 2007, letters, presumably the one addressed to Kline and Morrison about CHPP.

The State's Notice of Interlocutory Appeal was timely and specific enough to create appellate jurisdiction over the subpoena to Judge Anderson.

The record before us demonstrates that Kline intended to use Judge Anderson to accomplish at least three purposes. First, he wanted Judge Anderson to give traditional document custodian's testimony to authenticate or prove a link in the chain of custody

for the KDHE reports and the patient records produced in the Inquisition. Second, he wanted Judge Anderson to be a fact witness, one who would testify to the circumstances surrounding the opening and continuation of the Inquisition, and, specifically, the manner in which the submitted KDHE reports were produced by the agency and the "copies" by defendant. Finally, Kline repeatedly made it obvious that he hoped Judge Anderson also could function as a legal expert, repeating his earlier gratuitous opinions on the quality of the State's proof, which Judge Anderson had expressed at various times and in various settings throughout this and related cases.

Two initial points must precede our discussion of the document production and testimonial components of Judge Anderson's subpoena duces tecum.

First, Judge Tatum relied entirely on our April 4, 2008, protective order entered in *Morrison v. Anderson* to quash the subpoena duces tecum directed to Judge Anderson. The State's argument—that our protective order, because it was entered in an original action rather than in an appeal, carried no more weight than an order of another district court, which Judge Tatum could therefore feel free to ignore—is unsupported by pertinent authority. Failure to support a point by pertinent authority or to show why it is sound despite a lack of supporting authority is akin to failing to brief an issue. See *State v. Conley*, 287 Kan. 696, 703, 197 P.3d 837 (2008); *McCain Foods USA, Inc. v. Central Processors, Inc.*, 275 Kan. 1, 15, 61 P.3d 68 (2002).

That being said, we acknowledge that the April 4, 2008, protective order gave Judge Anderson and Six more relief than they sought when Judge Anderson filed his Notice of Collateral Proceedings and Six filed his emergency motion for protective order in *Morrison v. Anderson*. The initial scope of the order was nevertheless necessary to ensure the protection of patient privacy at the heart of this series of cases, given imperfect information from both sides of the dispute and the temporal exigency of a preliminary hearing we believed to be set for the next business day.

We further acknowledge that the eventual dismissal order in *Morrison v. Anderson* was silent on the continuing force of the

unamended portion of the protective order, which covered Judge Anderson's participation in this criminal prosecution. The discussion and holdings below constitute the "further order of this court" necessary under the protective order, correcting any initial overbreadth and otherwise refining its design in accord with the governing law and the now-apparent subject matter.

We note that Kline earlier attempted to obtain a modification of our April 4, 2008, protective order by moving to intervene in *Morrison v. Anderson*. This was the correct initial procedural avenue to obtain relief, but he nevertheless failed to demonstrate the appropriateness of intervention on the merits. His principal arguments appeared to focus on his desire to have Judge Anderson testify about his previously expressed opinions on the quality of the State's evidence against CHPP. As discussed below, a judge who presides over an inquisition should not later serve as an expert witness on the culpability of a criminal defendant prosecuted as a result of evidence gathered in the Inquisition. In addition, Kline's motion to intervene had structural and substantive flaws pointed out in Six' Response opposing it.

The modification of the April 4, 2008, protective order effected by this opinion necessitates modification in Judge Tatum's ruling based upon it, and it is affirmed in part and reversed in part as to Judge Anderson's subpoena duces tecum.

A. *Documents*

We first address the document production aspect of the subpoena duces tecum directed to Judge Anderson.

Judge Anderson cannot be subpoenaed to produce the first category of documents, *i.e.*, the reports produced by the KDHE during the Inquisition for the 23 patients whose abortions are the subjects of the felony counts in the complaint. Again, the District Attorney cannot be permitted to do indirectly what he cannot do directly under the plain and unambiguous language of K.S.A. 65-445. For this and all of the reasons discussed above with regard to the Crawford and KDHE records custodian, Judge Anderson cannot be ordered to produce for the District Attorney the reports that came from KDHE in the Attorney General's Inquisition.

These reports are "other protected matter" under K.S.A. 60-245(c)(3)(A)(iii), and the subpoena duces tecum is quashed as to them.

The fact that Judge Anderson apparently brought the KDHE reports to court when he testified at Judge Tatum's January 16, 2008, hearing on Kline's motion to disqualify defense counsel does not affect our holding on this issue. The record before us reveals no general objection to Judge Anderson's appearance as a witness or his production of the reports at that time, whether by Judge Anderson himself, KDHE, or CHPP; thus the potential prohibitive effect of K.S.A. 65-445 was not before Judge Tatum. We also note Judge Tatum did not admit the KDHE reports or any other document brought by Judge Anderson into evidence at that hearing, and none became a part of the public file. Counsel for CHPP did raise the issue of confidentiality when admission into evidence was sought for the KDHE reports and the CHPP patient records.

Judge Anderson may be ordered to produce for the district attorney the CHPP patient records produced by the defendant clinic in the Inquisition. Although these records clearly are confidential and constitutionally protected and statutorily privileged in their original pristine state—for all of the reasons already discussed by this court in our *Alpha* decision, see 280 Kan. at 919-25—the set the District Attorney seeks here was redacted for patient-identifying information by CHPP before they ever reached Judge Anderson's possession during the Inquisition. There has been testimony that a patient and her family may still be able to tell from the records if her abortion is the one documented. Judge Tatum should conduct an in camera review of the records and order any further redaction necessary to protect patient privacy and ensure compliance with this court's decision in *Alpha*. In addition, we are confident that Judge Tatum and the parties can design any further safeguards necessary at this stage. As we already noted, the Inquisition was unusual in that it led to an evidence custodian role for the supervising district judge. Now, as that custodian, Judge Anderson can be ordered to bring the CHPP patient records to court to facilitate this criminal prosecution.

Judge Anderson also may be ordered to produce for the Johnson County District Attorney Judge Anderson's April 18, 2007, Memorandum Decision and his July 13, 2007, letter to Kline and Morrison. (Judge Anderson's other July 13, 2007, letter regarding WHCS records is plainly immaterial to this criminal prosecution.) As with other documents that have previously been under seal in the Inquisition, Judge Tatum may need to make special arrangements for the transmission and storage of these documents. We have not been asked to determine at this time whether these documents constitute relevant and admissible evidence for trial. We leave those questions to Judge Tatum in the first instance, guided by the discussion of Judge Anderson's testimony below.

### B. *Testimony*

As Attorney General Six observed in opposing Kline's motion to intervene in *Morrison v. Anderson*, "asking a district judge to testify is a serious matter." *United States v. Ianniello*, 866 F.2d 540, 544 (2d Cir. 1989); see also *United States v. Frankenthal*, 582 F. 2d 1102, 1108 (7th Cir. 1978) (compulsion of judge's testimony "create[s] sensitive problems requiring delicate attention"); *In re Whetstone*, 580 S.E.2d 447, 448 (S.C. 2003) (collecting cases). Generally, "[a]bsent a showing of extraordinary need, a judge may not be compelled to testify about matters observed as the consequence of the performance of his [or her] official duties." *Hensley v. Alcon Laboratories, Inc.*, 197 F. Supp. 2d 548, 550 (S.D. W. Va. 2002). This rule allows judges to perform as arbiters of the law without fear of having to provide later explanatory testimony, and it prevents juries from being unduly influenced by judges' robes. *Hensley*, 197 F. Supp. 2d at 550; see *Inscoe v. Inscoe*, 121 Ohio App. 3d 396, 418, 700 N.E.2d 70 (1997). A judge should only be required to testify if he or she possesses factual knowledge; the knowledge is highly pertinent to the jury's task; and the judge is the only possible source of testimony on the relevant factual information. See *United States v. Roth*, 332 F. Supp. 2d 565, 568 (S.D.N.Y. 2004).

This common law is reflected in part by K.S.A. 60-442, which gives a party in a trial veto power over testimony of the presiding

judge. We do not routinely permit judges who handle preliminary hearings, for example, to testify at trial about their reasons for concluding there was probable cause to bind the defendant over for that trial. The role of such judges, like Judge Anderson's role here, should be and remain that of a neutral and detached magistrate, not a member of the prosecution or defense team. It also is consistent with our unwillingness to recall jurors to examine their thought processes in arriving at a verdict. See K.S.A. 60-441; see also *Roth*, 332 F. Supp. 2d at 567 (judge's testimony limited to factual knowledge; testimony as to mental processes impermissible); see also *Brinkerhoff v. Bank*, 109 Kan. 700, 709, 205 Pac. 779 (1921) (citing *Packet Co. v. Sickles*, 72 U.S. 580, L. Ed. 550 [1866] [judge's reasons for decision not admissible any more than those of jury]).

Given our rulings above on the reports produced by the KDHE during the Inquisition, it follows that Judge Anderson may not testify about the contents of any of the particular KDHE reports the subpoena duces tecum purports to order him to produce. This prohibition includes testimony from memory about those contents, as well as any comparison between those contents and the contents of any other sets of documents. Again, the Johnson County District Attorney cannot be permitted to do indirectly what he is forbidden to do directly under K.S.A. 65-445.

Judge Anderson may, however, testify as a fact witness about any relevant events of the Inquisition that led to and followed KDHE's production of reports to Kline when he was Attorney General.

In this extraordinary case, Judge Anderson also may give traditional document custodian testimony, insofar as it is relevant, about the redacted CHPP patient records, *i.e.*, authenticate them as the documents that came into his possession during the Inquisition. He also may testify as a fact witness on how the Inquisition began and was conducted, how the dispute leading to *Alpha* arose and was resolved, how he set up a procedure to comply with *Alpha*'s directives, and how that process was pursued. In particular, he may testify to the limits of his personal factual knowledge about CHPP giving the redacted patient records to him and/or Cavanaugh and events that followed.

Regarding the content of his April 18, 2007, Memorandum Decision and his July 13, 2007, letter to Kline and Morrison, it appears from the record before us and the earlier statements of Kline in his time as Johnson County District Attorney that the State intended to use Judge Anderson and the opinions he expressed in these documents as substantive evidence of CHPP's culpability. We have previously described as "most troubling" the State's invocation of a judge's prior determination of probable cause before a jury. *In re Care & Treatment of Foster*, 280 Kan. 845, 858, 127 P.3d 277 (2006). The use to which Kline repeatedly indicated he wanted to put Judge Anderson's testimony on the judge's evaluation of the evidence against CHPP in this criminal prosecution is similar in kind and in potential unduly prejudicial effect. It is not fact witness testimony; and Judge Anderson was not, by virtue of his participation in the Inquisition, automatically transformed into an expert witness who may give opinion testimony on the issue of CHPP's criminal culpability.

But we do not know whether Kline's intention persists in Howe, Kline's successor in the Johnson County District Attorney chair. Howe's representative at oral argument before this court appeared unsure on this point. We therefore leave to Judge Tatum on remand the question of what use, if any, under the strict standards set forth above, Judge Anderson's testimony based on these two documents may be put by any party.

*Cavanaugh Subpoena Duces Tecum*

Again, as outlined above, the subpoena duces tecum directed to special counsel Cavanaugh called for his testimony and the production of his September 10, 2007, affidavit and three pieces of August 2006 correspondence between him and CHPP counsel. The correspondence followed Cavanaugh's inquiry about written determinations of fetal viability missing from the patient records as initially produced by CHPP. One of those pieces of correspondence is the August 21, 2006, letter from Irigonegaray to Cavanaugh, which enclosed the KDHE reports described as "copies" and upon which Kline said he would so heavily depend to prove the felony counts in this criminal prosecution.

The State's Notice of Interlocutory Appeal was timely and specific enough to create appellate jurisdiction over the Cavanaugh subpoena.

As an initial matter on this subpoena duces tecum, we note that Cavanaugh was not covered by this court's April 4, 2008, protective order. However, when Judge Anderson received it, he issued an order of his own, ostensibly in the Inquisition that had already been closed by Attorney General Morrison, to prevent Cavanaugh from appearing or producing documents in this criminal prosecution. In addition, Judge Anderson filed his motion for protective order on behalf of himself and Cavanaugh. After hearing, Judge Tatum apparently quashed the subpoena duces tecum directed to Cavanaugh for the same reason he quashed the subpoena duces tecum directed to Judge Anderson.

Again, this opinion constitutes the "further order of this court" referenced in our April 4, 2008, protective order. It appears that Judge Tatum's ruling regarding Cavanaugh entirely rested upon our protective order, as extended to cover Cavanaugh by Judge Anderson. Indeed, it is now apparent that our protective order would have explicitly covered Cavanaugh as well as Judge Anderson when the order was first entered, had this court been made aware that Cavanaugh also had been subpoenaed to appear and produce documents at the preliminary hearing. In any event, as with Judge Anderson, our modification of order in this opinion requires Judge Tatum's ruling regarding Cavanaugh to be affirmed in part and reversed in part.

A. *Documents*

Cavanaugh may also be compelled to produce the letters that passed between him and CHPP counsel in the process of redacting and gathering CHPP patient records in the Inquisition. We have not been asked to determine at this time whether these documents constitute relevant and admissible evidence for trial. We leave those questions to Judge Tatum in the first instance, guided by the discussion of Cavanaugh's testimony below.

### B. *Testimony*

Cavanaugh may be compelled to appear as a fact witness on CHPP's production of patient records in response to the Inquisition, including explanation of the procedure set up by Judge Anderson under *Alpha* and the communications between Cavanaugh and CHPP counsel in the summer of 2006. If, as it appears from the record as developed thus far, Cavanaugh was a temporary custodian of CHPP patient records, he may also be compelled to give traditional document custodian testimony. Like Judge Anderson, however, Cavanaugh was not automatically transformed by his participation in the Inquisition into an expert witness who may give opinion testimony on CHPP's criminal culpability. It is unclear what the State's current intentions are in this regard, and we leave appropriate limitations, if any, on Cavanaugh's testimony to Judge Tatum's careful consideration on remand.

### CONCLUSION

This court lacks jurisdiction to address Judge Tatum's ruling quashing the subpoena duces tecum directed to Saadi, and, insofar as this interlocutory appeal addresses that ruling, it is dismissed.

Judge Tatum's ruling on the subpoenas to the KDHE records custodian and Crawford is affirmed in part and reversed in part, based on K.S.A. 65-445, as detailed in the foregoing opinion.

As to the Subpoenas Duces Tecum directed to Judge Anderson and Cavanaugh, this opinion constitutes a further order of this court superseding the April 4, 2008, protective order in *Morrison v. Anderson.* Judge Tatum's rulings on those subpoenas are affirmed in part and reversed in part.

Affirmed in part, reversed in part, and remanded to the district court for further proceedings consistent with this opinion.